# STATE OF CONNECTICUT *v.* DEBRA GRACEWSKI
## (AC 19619)

Foti, Landau and Pellegrino, Js.

Argued December 8, 2000—officially released February 13, 2001

*G. Douglas Nash*, public defender, with whom were *Jessica A. Ballou*, certified legal intern, and, on the brief, *Pamela S. Nagy*, former assistant public defender, and *Maria Cahill*, certified legal intern, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Anne F. Mahoney*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Debra Gracewski, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3)[1] and risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1.[2] On appeal, the defendant claims that the evidence as to her identity as the perpetrator was insufficient to sustain her conviction on either charge and that the evidence as to recklessness was insufficient to sustain her conviction of manslaughter in the first degree. The defendant also claims that the court's alleged interference and misconduct during the trial deprived her of

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[2] General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1, provides: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, shall be guilty of a class C felony."

a fair trial, and that the court improperly instructed the jury.[3] We disagree with the defendant's claims and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant had been employed for several weeks prior to the incident underlying this action by her cousin, Shelley Rowe, as a baby-sitter for Rowe's son, Shawn, the victim. Rowe worked away from home during the day. At the time of the incident at issue, September 18, 1996, the victim was three months old. Early in the day on September 17, 1996, Rowe took the victim to Harold Shapiro, his pediatrician, for a routine well-child examination. Despite the fact that Rowe thought the victim was behaving in a "fussy" manner during the previous evening, Shapiro found him to be in good physical health with no symptoms of head injury when he examined him. The defendant slept at Rowe's home on the evening of September 17, 1996.

On the morning of September 18, 1996, Rowe found the victim to be behaving well, and after she changed and dressed him at approximately 7:30 a.m., she entrusted his care to the defendant. Soon after Rowe left for work, the defendant called her mother, Diane Gracewski, to request a ride to a bank. At 8:25 a.m., one of Rowe's neighbors in her two-family duplex home overheard the victim screaming loudly. The defendant called Diane Gracewski a second time and told her that the victim was behaving poorly. When Diane Gracewski arrived at Rowe's home, she found the victim crying and tensing his muscles. She noticed the victim's paci-fier, with blood on it, on a nearby table. Diane

---

[3] The defendant withdrew two additional claims at oral argument. The defendant had claimed that the court improperly admitted her statement as evidence at trial because (1) the police obtained it as a result of a custodial interrogation without advising her of her rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and (2) she did not give her statement voluntarily.

Gracewski later told the police, however, that when she arrived, the victim was sleeping. Despite the victim's problems, Diane Gracewski took the defendant to a bank and left for work soon thereafter. The defendant called several relatives during the morning to solicit advice because she believed that the victim was not behaving well. Rowe called the defendant at 1 p.m. to check on her son. The defendant told Rowe that she saw blood on the victim's pacifier and called the victim's maternal grandmother, Pauline Rowe, to help her care for him.

Pauline Rowe arrived at Shelley Rowe's house around 1 p.m. and found the victim in very poor condition. His body was so stiff that he could not be fastened in his car seat. Pauline Rowe immediately contacted Shapiro and took the victim to his office for treatment. Shapiro found him to be experiencing generalized active seizures and crying. Shapiro instructed Pauline Rowe and the defendant to take the victim to Rockville General Hospital. Shortly after his arrival at the hospital, the victim was transported to Connecticut Children's Medical Center in Hartford and placed in the intensive care unit for treatment. He remained at the medical center until his death on September 22, 1996.

The defendant told the police that the victim had cried several times during the morning, and she admitted being "frustrated" with his behavior. She said that his stomach was bulging and that she "shook him for approximately five to ten seconds" in an attempt to "get him to burp." She said that in addition to shaking the victim, she "may have hit his head." She told the police that she did not intend to hurt him, did not shake him "seriously enough to cause any injury" and wanted only to help relieve the discomfort that was making him act so fussy.

The physicians who treated the victim at the Connecticut Children's Medical Center found swelling of his

brain and a subdermal hematoma in the back of his brain that resulted from torn blood vessels. He suffered from severe hemorrhaging in his eye and from generalized seizures. The physicians also noticed a small tear under his tongue that would have been consistent with an object having been shoved into his mouth. Experts who testified at trial agreed the victim's injuries were caused by violent shaking, a condition medically called "shaken baby syndrome." The victim's injuries occurred because, after Shelley Rowe left for work, the defendant forcefully shook him for at least five to ten seconds, and slammed him down on a soft surface. Symptoms of his injuries manifested themselves relatively quickly, likely within several minutes after the shaking occurred. The injuries to his head and other internal injuries, symptoms of "shaken baby syndrome," caused his death.

## I

The defendant claims that the state failed to present sufficient evidence to prove beyond a reasonable doubt that she was the person who committed the crimes for which she was convicted. She also claims that the evidence was insufficient to support her conviction for the crime of manslaughter in the first degree because the state failed to sustain its burden of proving recklessness beyond a reasonable doubt. We disagree.

"When reviewing sufficiency of the evidence claims, we impose a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. . . . *State* v. *Rivera*, 32 Conn. App. 193, 200–201, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993)." (Internal quotation marks omitted.) *State*

v. *Laws*, 37 Conn. App. 276, 281, 655 A.2d 1131, cert. denied, 234 Conn. 907, 659 A.2d 1210 (1995). "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132, 646 A.2d 169 (1994). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." Id., 134.

### A

The defendant first claims that the evidence as to the identity of the perpetrator was insufficient to support the jury's verdict. She argues that the evidence failed to show that she was any more likely to have caused the victim's injuries than the other persons in contact with him that day, and that her mere presence and interaction with the victim is insufficient to support the conclusion that she caused his injuries. We disagree.

As we previously stated, in determining whether evidence is sufficient to support a verdict, we review the evidence in the light most favorable to upholding the verdict. *State* v. *Pauling*, 47 Conn. App. 483, 487, 706 A.2d 981 (1998).

"[I]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 195, 695 A.2d

6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997). "That the [trier of fact] might have drawn other possible inferences from [the evidence] is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt." (Internal quotation marks omitted.) *State* v. *Patterson*, 229 Conn. 328, 332, 641 A.2d 123 (1994).

The evidence established that the victim enjoyed good health when Shapiro examined him on September 17, 1996, and that he was in fine health and spirit when Shelley Rowe left him with the defendant on the morning of September 18, 1996. The medical evidence, the defendant's admission that she had shaken the victim that morning and all the other circumstantial evidence presented at trial sufficiently supported the conclusion that the defendant was the person who inflicted the victim's fatal injuries.

## B

The defendant also contends that there was insufficient evidence of recklessness to support the conviction of manslaughter in the first degree in that the state failed to prove that she subjectively was "aware of and consciously disregard[ed] a substantial and unjustifiable risk."[4] We disagree.

This court reviews a sufficiency of the evidence claim by determining "whether the jury reasonably could have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable

[4] General Statutes § 53a-3 provides in relevant part: "Except where different meanings are expressly specified, the following terms have the following meanings when used in this title . . .

"(13) A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

doubt." (Internal quotation marks omitted.) *State* v. *Jones*, 34 Conn. App. 807, 811, 644 A.2d 355, cert. denied, 231 Conn. 909, 648 A.2d 158 (1994).

A conviction under § 53a-55 (a) (3) requires proof beyond a reasonable doubt that the defendant, under circumstances evincing extreme indifference to human life, recklessly engaged in conduct that created a grave risk of death to the victim and thereby caused the death of the victim.

Our review of the record discloses that the defendant had baby-sitting experience and that Rowe previously had warned the defendant never to shake or bounce the victim because that could cause him injury. Additional evidence enabled the jury to conclude that the defendant possessed the mental capacity to understand and to appreciate the gravity of the risk involved in violently shaking young children. From the evidence presented, which obviously was accepted as true by the jury, the defendant forcefully shook the victim for five to ten seconds and then slammed him down onto a mattress or other soft object, causing his head to decelerate rapidly. The jury also considered evidence of the defendant's educational background, i.e., that she was a high school graduate, her IQ and her capacity to understand instructions and her mental condition in general.

In cases in which recklessness is an element of the crime, such as the crime of manslaughter in the first degree, a court may admit evidence of a defendant's mental capacity to show that the defendant possessed the requisite mental state for the commission of the crime with which he or she is charged. See *State* v. *Burge*, 195 Conn. 232, 240, 487 A.2d 532 (1985). The court instructed the jury to consider the evidence regarding the defendant's mental state. It was the jury's duty to resolve the conflicting evidence as to that issue by evaluating the credibility of the witnesses on the

basis of its firsthand observation of their conduct, demeanor and attitude. See *State* v. *McClam*, 44 Conn. App. 198, 208, 689 A.2d 475, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997). We conclude that the evidence presented sufficiently permitted the jury to find that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk.

## II

The defendant claims that the court engaged in certain instances of misconduct, thus denying her a fair trial. She claims that "the court showed contempt for the defense attorney in the jury's presence, acted as an advocate by questioning key witnesses and improperly characterized the evidence." We disagree.

At no point during the trial did the defendant object to any of the court's actions now alleged to have been improper or seek a mistrial. Additionally, the defendant did not object to any allegedly improper instruction that the court gave to the jury.[5] We review this claim "only to determine whether the court's actions deprived the defendant of his constitutional right to due process of law." *State* v. *Tatum*, 219 Conn. 721, 739, 595 A.2d 322 (1991). "The risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the merits of the trial." *State* v. *Woodson*, 227 Conn. 1, 31, 629 A.2d 386 (1993).

We conclude, after reviewing the record, that the defendant's claim of judicial misconduct is without merit. Although the defendant states in her brief that "[t]he record is replete with examples" of judicial misconduct, she points to five specific instances of allegedly impermissible interference by the court. Our review does not require us to set forth and discuss each

---

[5] The defendant seeks review of this unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

separate claim. Our review of the entire record supports our conclusion that although the court during the trial may have demonstrated frustration, made attempts at wit or made an inappropriate comment, the defendant has failed to demonstrate a level of prejudice sufficient to affect, in any perceivable manner, the fairness of the trial. See *State* v. *Mack*, 197 Conn. 629, 643, 500 A.2d 1303 (1985). As our Supreme Court has stated, "[w]e are reluctant to award a new trial where those most concerned, better placed than we to assess the courtroom atmosphere, did not view the remarks to be so prejudicial as to warrant a new trial and preferred to stake the outcome on the trial under way." Id., 642.

The defendant also contends that the court improperly questioned witnesses. A trial court possesses a discretionary right to intervene in the examination of witnesses for certain purposes, such as to clarify confusing testimony, to restrain an obstreperous witness or to elucidate a witness' understanding of a question. *State* v. *Fernandez*, 198 Conn. 1, 12, 501 A.2d 1195 (1985). A court's questioning of a witness is not necessarily improper, even if it draws attention to the strengths or weaknesses of a party's case. *State* v. *Echols*, 170 Conn. 11, 14, 364 A.2d 225 (1975). The court should not fashion any question in a manner that reflects on the credibility of a witness. See *State* v. *Fernandez*, supra, 14–15. Our review of the record supports our conclusion that none of the court's questions reflected on the credibility of any witness, nor did any of the court's inquiries demonstrate partisanship.

The defendant also argues that the court highlighted for the jury certain unfavorable testimony from William Harrington, a pathologist, and "emphasized this harmful evidence over everything else that he said." The defendant has neither specifically identified the challenged statements in her brief, nor furnished any type of analysis of that particular claim. "Assignments of error which

are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Carano* v. *Moomey*, 51 Conn. App. 382, 387, 721 A.2d 1240 (1998). The defendant cannot prevail on this unpreserved claim of judicial misconduct.

### III

The defendant finally claims that the court improperly instructed the jury on the defense of diminished capacity. The defendant does not contend that the court misstated the law, but rather that the court should have provided more instruction to the jury concerning that defense. She asserts that the court did not explain who bears the burden of proof as to that defense and what the jury should do if it found that she had a diminished capacity. We disagree.

The following additional facts are necessary to our resolution of this issue. The court properly instructed the jury to hold the state to its burden of proving each element of the crimes charged beyond a reasonable doubt and instructed the jury about its duty to acquit the defendant if reasonable doubt concerning her guilt existed. As to diminished capacity, the court instructed: "The purpose of this particular instruction is to instruct you on diminished capacity. Evidence, if you believe it, was submitted to establish the defendant's impaired cognitive ability. [A licensed psychologist, Bernard Pellet,] classified her as [having] borderline intelligence. You must determine whether the evidence of diminished capacity is sufficient to raise reasonable doubts as to the existence of general intent, the ability to perceive substantial and unjustifiable risks, acting recklessly, extreme indifference to human life and performing acts likely to impair the health of a child. You must be satisfied from the defendant's presentation that there is direct evidence of the effects of her various mental

disorders on her capacity to form a general intent, her ability to perceive substantial and unjustifiable risks, reckless conduct, extreme indifference to human life and doing acts likely to impair the health of a child."

"A jury instruction is constitutionally adequate it if provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present." (Internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 781, 695 A.2d 525 (1997). "The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Ash*, 231 Conn. 484, 494, 651 A.2d 247 (1994).

When viewed as a whole, the court's charge sufficiently guided the jury as to the state's burden of proof, the effect of a reasonable doubt and that evidence of a diminished capacity may be sufficient to raise such a reasonable doubt. The defendant presented direct evidence on the issue of diminished capacity and submitted a written request to charge with the following instruction: "It is requested that the court charge on the defense of diminished capacity, as evidence was presented that the defendant is of borderline intelligence, and lacks the comprehension possessed by the majority of the population." The charge adequately instructed the jury that the defendant introduced evidence of her diminished capacity for the purpose of overcoming the element of recklessness, which the state was required to prove beyond a reasonable doubt to prove that the defendant committed the crime of manslaughter in the first degree. The court's charge established that the state carried the burden of proving the defendant's mental state beyond a reasonable doubt.

We conclude that the court's instruction on diminished capacity did not mislead the jury or result in an injustice to the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.